Sheila B. STEPP, Plaintiff–Appellant,

v.

Carolyn COLVIN, Acting Commissioner of Social Security, Defendant–Appellee.

No. 14–3163.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 2015.

Decided July 31, 2015.

Timothy E. Burns, Attorney, Keller & Keller, Indianapolis, IN, for Plaintiff–Appellant.

Javitt J. Adili, Attorney, Social Security Administration Office of the General Counsel, Chicago, IL, Defendant–Appellee.

Before BAUER, FLAUM, and HAMILTON, Circuit Judges.

FLAUM, Circuit Judge.

Appellant Sheila Stepp, who suffers from degenerative disc disease and a variety of other impairments, seeks disability insurance benefits under Title II of the Social Security Act. Following a hearing, an Administrative Law Judge ("ALJ") issued a decision denying Stepp's claim. While acknowledging that Stepp suffered from chronic pain, the ALJ concluded that surgery, medication, and therapy had resulted in an improvement in Stepp's condition such that she retained the capacity to engage in sedentary work. Stepp sought review of the ALJ's decision by the Social Security Administration's Appeals Council, and submitted additional evidence in the form of medical records created just prior to the ALJ's denial of her disability claim. This evidence—specifically, the treatment notes of pain management specialist Dr. Allan MacKay—tends to suggest that Stepp's condition did not improve over the course of the adjudicative period to the extent that the ALJ estimated. The Appeals Council summarily declined to engage in plenary review of the ALJ's decision and, in so doing, did not expressly address Dr. MacKay's notes. The United States District Court for the Southern District of Indiana affirmed the ALJ's final decision.

Stepp appeals the district court's determination on two grounds: first, she contends that the ALJ's denial of her benefits request was not supported by substantial evidence; second, she argues that a remand for further proceedings is necessary in light of the "new and material" evidence presented by Dr. MacKay's medical records. We believe that the ALJ properly analyzed a range of conflicting testimony and medical opinions and reached a conclusion adequately supported by the record before her. However, we agree with Stepp that the denial notice from the Appeals Council indicates that the Council did not accept Dr. MacKay's treatment notes as new and material evidence, and we conclude that the Council made that determination in error. We therefore remand the case to the agency so that it may reevaluate Stepp's condition in light of the information presented in Dr. MacKay's notes.

## I. Background

In January 2010, Sheila Stepp—a former correctional officer, training secretary and coordinator, and parole probation officer—applied for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, with an alleged disability onset date of November 18, 2009. At the time, Stepp was 47 years old, 5′6″ tall, and weighed 237 pounds. Her asserted disabilities consist primarily of degenerative disc disease and depression.

Stepp began seeking treatment for chronic neck pain in October 2008 and underwent several MRIs, which revealed multi-level degenerative disc disease of the cervical and upper thoracic spine, with multiple disc herniations as well as significant foraminal stenosis. Stepp was referred to orthopedic surgeon Dr. Stephen Ritter in February 2009. She complained

to Dr. Ritter of chronic pain in her neck, chest, shoulder, and arm, and further alleged numbness in her legs and her right hand, balance problems, memory loss, trouble sleeping, and severely limited range of motion. Upon examination, Dr. Ritter observed that Stepp had balanced posture and a balanced gait and that she had full grip strength; he ranked her deltoid strength at 4 out of 5. He also noted weakness in both upper extremities, though no obvious loss of muscle tone. In April 2009, Dr. Ritter performed an anterior cervical discectomy and fusion. At a follow-up appointment in June, Stepp reported total pain relief in her neck and no pain, numbness, or tingling in her hands or arms. Dr. Ritter concluded, however, that Stepp should refrain from working until she was "fairly far along" in the healing process; he estimated that she would be able to return to work "without restrictions" by mid-September, approximately five months after the surgery.

In late June 2009, Stepp sought treatment from primary care physician Dr. Meredith McCormick. An MRI of Stepp's lumbar spine revealed multi-level degenerative changes and slight retrolisthesis. Stepp began to see a physical therapist for pain management but discontinued therapy in September 2009 as a result of "stabbing pain" in her lower back, which worsened with bending, sitting, standing, or walking. Nevertheless, Stepp returned to work by early November. But during an appointment with Dr. McCormick on November 18, 2009, she complained of worsening back and chest pain, prompting Dr. McCormick to order a thoracic MRI; the MRI revealed severe degenerative disc disease and arthritis, as well as significant spinal canal stenosis cord impingement with possible myelomalacia.[1] In early December, Stepp again met with Dr. Ritter

and described severe back and abdominal wall pain. Dr. Ritter concluded that "Ms. Stepp is pretty incapacit[ated] by her scapular and [abdominal] wall pain at this time." In December 2009 and January 2010, Dr. Ritter administered a selective thoracic nerve root block and a thoracic epidural injection. At a follow-up appointment on January 18, 2010, Stepp reported feeling "much better" but explained that she did not feel that she could "quite go back to work given the pain that she still ha[d] with reaching and twisting." Dr. Ritter agreed that Stepp should "hold off on work for another few weeks." After renewed complaints of persistent back pain, Dr. Ritter performed additional surgery—a discectomy and fusion—in March 2010. On April 15, 2010, Stepp reported that she had "not felt this good in a long time," and noted that the significant lower extremity dysfunction that she experienced prior to surgery was gone.

In April 2010, consulting psychologist Dr. J. Mark Dobbs examined Stepp at the state agency's request. Dr. Dobbs noted that Stepp, who had undergone back surgery just two weeks earlier, walked very slowly and used a walker. After learning of Stepp's lengthy history of depression, Dr. Dobbs diagnosed her with post-traumatic stress disorder (a result of childhood abuse) and dysthymia—a mild, long-term form of depression. Dr. Dobbs assigned Stepp a Global Assessment of Functioning ("GAF") score of 59, indicating moderate symptoms. State agency psychologist Dr. B. Randal Horton also completed a psychiatric review and concluded that Stepp's ability to work was unaffected by her mental impairments.

Consulting physician Dr. Mohamad Mokadem also examined Stepp. He noted her reported improvement following her

---

1. Since November 18, 2009, Stepp has been intermittently authorized by physicians to return to work; however, she has not actually worked since that date.

two spinal surgeries but determined that she "still [could] not go back to her job because of limitation in her movement as well as ... her persistent daily pain." However, Dr. Mokadem concluded that Stepp's pain caused her only "mild distress." He also concluded that Stepp's gait was grossly normal, her muscle strength and tone were normal, her deep tendon reflexes were normal, and her grip strength and fine finger skills were normal. State agency physician Dr. A. Dobson reviewed the record in late May 2010 and performed a Residual Functional Capacity ("RFC") assessment, concluding that Stepp could perform light work—that is, she could lift twenty pounds occasionally and ten pounds frequently, and could stand or walk for up to six hours during an eight-hour workday. He further concluded that she could only occasionally climb stairs, balance, kneel, or crouch, and that she could not climb ladders, ropes, or scaffolds. Dr. Dobson also determined that the record did not indicate any manipulative, visual, or communicative limitations.

By July 2010, Dr. Ritter had cleared Stepp to resume work. Stepp reported to Dr. McCormick that her back pain was "much, much better." In addition, Stepp stopped taking oxycodone, though she continued to take less potent pain medications. On July 26, 2010, Dr. McCormick—who at that point had treated Stepp for over a year—completed a questionnaire evaluating Stepp's RFC. Contrary to Dr. Ritter's assessment, Dr. McCormick concluded that Stepp could sit, stand, and walk for less than two hours during an eight-hour workday—thereby entirely precluding the possibility of work. However, Dr. McCormick made clear that she anticipated Stepp's condition would improve after she underwent scheduled changes to her medication. Dr. McCormick noted in her questionnaire: "I fill this out based on how [Stepp] is now. Anticipate improvement with hospitalization by pain [doctor]

for med changes. Unclear how [Stepp] will progress [with] regards to pain. This is her main limitation. Hope hospitalization will improve function significantly." Dr. McCormick further stated that she did not feel comfortable opining as to Stepp's potential pain-related limitations following her impending hospitalization.

Treatment notes prepared by pain specialist Dr. Bruce Durell indicate that Stepp reported sleeping well after her medication changes and that her pain control was generally good, particularly with the aid of a transcutaneous electrical nerve stimulation ("TENS") unit. Nevertheless, Stepp continued to experience major depression. In October 2010, Dr. Durell started Stepp on a regimen of Cymbalta and Flexeril. On November 1, after renewed complaints of sharp spinal pain that worsened while sitting and standing, Dr. Durell diagnosed Stepp with chronic lower back and neuropathic pain and determined that she should remain off work. Over the course of several follow-up visits, however, Dr. Durell observed that Stepp experienced "improvement" in her pain level and that she was "responding well to therapy."

In June 2011, Stepp—who had begun to experience pain and numbness in her left hand—visited a new primary care physician, Dr. Meredith Lulich. Dr. Lulich diagnosed Stepp with moderate left carpal tunnel syndrome with slightly diminished grip strength.

On August 24, 2011, Stepp testified at a hearing before Administrative Law Judge JoAnn L. Anderson. Stepp explained that her impairments developed gradually and that she had been unable to work since November 2009. She described her pain management regimen—which included several medications, icing, daily use of a TENS unit, and stretching—and noted that while no treatment completely eliminated her pain, her medication was "excel-

lent." She explained that her physical abilities varied depending on the day: for instance, some days she was unable to walk at all, but on "good days," she could often walk six blocks. She could also assist with some household chores (e.g., washing the dishes) on good days, though could not complete any tasks that required her to raise her upper arms far from her body. She further mentioned that she dropped things "all the time," and explained that each "good day" was typically followed by a bad one. A vocational expert also testified. The expert concluded that Stepp had the capacity to perform "sedentary work" with only occasional climbing, balancing, kneeling, crouching, crawling, and overhead reaching, and no climbing of ladders or scaffolds. The expert conceded that these limitations would preclude Stepp from returning to the jobs she had held in the past; however, he determined that Stepp could perform a variety of other jobs, including surveillance system monitor, circuit board assembler, and document preparer.

On November 21, 2011, the ALJ issued a decision denying Stepp's request for benefits and concluding that Stepp had failed to demonstrate the inability to "engage in any substantial gainful activity by reason of [a] medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Applying the Social Security Administration's requisite five-step analysis for disability claims, see 20 C.F.R. § 416.920(a)(4), the ALJ found in Stepp's favor as to steps one and two, concluding first that Stepp had not engaged in "substantial gainful activity" since her alleged disability onset date, and second, that Stepp suffered from multiple "severe" impairments—namely multilevel degenerative changes and status post cervical and thoracic surgical procedures. (The ALJ also concluded that

Stepp's other alleged impairments—hypertension, diabetes, carpal tunnel syndrome, and depression—were not severe as they resulted in only minimal limitations on her ability to perform basic work activities.) At step three, however, the ALJ determined that Stepp's impairments did not medically "meet[ ] or equal[ ]" the severity of any impairment considered by the agency to be "conclusively disabling." *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir.2008). As a result, the ALJ proceeded to step four, where she assessed Stepp's Residual Functional Capacity in an effort to determine Stepp's ability to engage in past relevant work.

The ALJ adopted the vocational expert's conclusion that Stepp retained the ability to perform sedentary work, with certain additional limitations (e.g., no use of ladders). The ALJ recognized that Stepp's impairments prevented her from walking more than one to two blocks before stopping to rest, and noted further that Stepp experienced constant aching pain along her entire spine. The ALJ also discussed various conflicting medical opinions contained in the record. She noted, for instance, that Dr. Ritter had cleared Stepp to return to work in July 2010 (four months after her back surgery) while Dr. McCormick issued a work-preclusive opinion around the same time; however, the ALJ assigned that opinion "little weight" as Dr. McCormick expressly qualified her assessment by stating that she anticipated that Stepp's condition would improve. The ALJ also cited an October 26, 2010 note from Dr. McCormick, indicating that Stepp's symptoms had indeed improved, particularly with the use of a TENS unit. The ALJ determined that Stepp had responded positively to pain management therapy and cited a June 22, 2011 medical note in which Stepp reported feeling "well with minor complaints." The ALJ concluded that, through medication, surgery, and therapy,

Stepp had been successfully treated for degenerative changes and had experienced improvement throughout the adjudicative period—that is, the period between Stepp's alleged disability onset date (November 18, 2009) and the date on which the ALJ issued her decision (November 21, 2011).

The ALJ acknowledged that Stepp would be unable to return to her past work given her physical limitations; however, based on the vocational expert's testimony, the ALJ concluded under step five of the disability analysis that there existed a significant number of alternative jobs in the national economy that Stepp could perform. In light of this analysis, the ALJ determined that Stepp was not disabled.

On November 21, 2011—the same day the ALJ issued her decision denying Stepp's claim—Stepp submitted additional evidence to the agency's Appeals Council. Among that evidence was a series of treatment notes, dated between September 20 and October 25, 2011, from pain management specialist Dr. Allan MacKay. His notes reveal that Stepp continued to experience severe back and neck pain during this period and that in both September and October, Dr. MacKay administered nerve block injections to Stepp's lumbar spine and sacroiliac joint. The notes also discuss the results of several recent MRIs, which demonstrated additional degenerative changes throughout Stepp's thoracic spine, degenerative disc disease throughout her lumbar spine, and several disc protrusions. In addition, Dr. MacKay's notes mention that a cervical fusion had been scheduled for December 1, 2011. Several months later, Stepp again submitted additional evidence to the Appeals Council; however, much of this evidence relates to Stepp's symptoms in the months following the issuance of the ALJ's decision and is therefore largely irrelevant to this appeal.

On March 19, 2013, the Appeals Council issued a notice summarily denying Stepp's request for review. Stating that it had "considered the reasons [Stepp] disagree[d] with the decision and the additional evidence listed on the enclosed Order of Appeals Council," the Council reached the conclusion that "this information d[id] not provide a basis for changing the [ALJ]'s decision." The Council listed Dr. MacKay's treatment notes as Exhibit 26F on the accompanying order; however, the body of the Appeals Council notice does not reference these notes.

Stepp filed a civil action in the United States District Court for the Southern District of Indiana, raising various objections to both the ALJ's decision and the Appeals Council's denial of her request for review. The district court rejected her challenge to the ALJ's reasoning and concluded, pursuant to 42 U.S.C. § 405(g), that the ALJ's findings were supported by substantial evidence. However, the district court determined that a remand was necessary under sentence six of § 405(g) to allow for examination of Dr. MacKay's medical records. The court concluded that the Appeals Council did not address these records, which the court found to contain new evidence material to Stepp's disability claim. The district court explained that Dr. MacKay's notes elucidated the degree of Stepp's pain toward the end of the adjudicative period and indicated that her condition had not improved over time, as her other treating physicians had anticipated it would. The court therefore remanded the case to permit the ALJ to review Dr. MacKay's notes.

In response, the Commissioner of Social Security filed a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e), arguing that the Appeals Council had, in fact, evaluated Dr. MacKay's treatment records and had ade-

quately explained its reasons for concluding that Stepp had not established a basis for changing the ALJ's decision. The district court reluctantly accepted the Commissioner's argument that because Dr. MacKay's records were listed as exhibits to the Council's order, the Council must have reviewed them. And, because there is no requirement in this circuit that the Council articulate its reasons for denying plenary review of ALJ decisions, the district court determined that the Council's cursory explanation of its determination was adequate. The court criticized the Council's "woefully deficient" decision, noting that the Council "announced it's [sic] conclusion in a single, unexplained sentence," and that such an "unsupported statement makes it nearly impossible for a reviewing judge to evaluate th[at] conclusion." *Stepp v. Colvin*, No. 2:13–cv–179, 2014 WL 3809661, at *3 (S.D.Ind. Aug. 1, 2014). The court nevertheless entered an amended judgment affirming the ALJ's decision. Stepp now appeals.

## II. Discussion

Stepp raises two claims on appeal: first, she argues that the ALJ's unfavorable decision was not supported by substantial evidence; second, she contends that the evidence submitted to the Appeals Council following the ALJ's decision—specifically, Dr. MacKay's treatment notes—merits remand for additional consideration.

### A. Review of the ALJ's Decision for Substantial Evidence

■ In reviewing the ALJ's denial of Stepp's disability claim, we inquire whether the ALJ's decision was supported by substantial evidence. 42 U.S.C. § 405(g). We have defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008) (citation and internal quotation marks omitted). As such,

our review is "extremely limited." *Id.* "We are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. In fact, even if reasonable minds could differ concerning whether [the claimant] is disabled, we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported." *Id.* (citations and internal quotation marks omitted).

Stepp challenges several aspects of the ALJ's assessment of her Residual Functional Capacity. Specifically, she complains that the ALJ: (1) improperly declined to give controlling weight to Dr. McCormick's medical opinion; (2) failed to discuss Dr. Ritter's opinions regarding Stepp's short-term inability to work; (3) ignored crucial evidence relating to Stepp's alleged manipulative impairment; (4) neglected to address her obesity; and (5) reached a patently wrong credibility determination regarding her testimony. We address each contention in turn.

■ Stepp first takes issue with the fact that the ALJ did not give Dr. McCormick's work-preclusive assessment controlling weight. We uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Luster v. Astrue*, 358 Fed.Appx. 738, 740 (7th Cir.2010) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir.2001)). The ALJ expressly assigned "little weight" to Dr. McCormick's July 26, 2010 evaluation because, by its own terms, the evaluation "[a]nticipate[d] improvement" in Stepp's condition. Dr. McCormick explained that although at that point in time—shortly after Stepp had undergone surgery—Stepp's pain prevented her from sitting, standing, or walking for even two hours per day, Stepp was scheduled to undergo significant changes to her pain medication just days later. Although Dr. McCormick

did not express certainty, she stated that she "[h]ope[d] hospitalization w[ould] improve function significantly." Dr. McCormick also explicitly declined to opine as to Stepp's potential pain-related limitations following her medication changes.

Under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion should receive controlling weight if it is well supported by medically acceptable clinical techniques and not inconsistent with other substantial evidence in the record. Here, not only is Dr. McCormick's entirely work-preclusive opinion inconsistent with the opinions of other physicians (including Dr. Dobson and Dr. Ritter), but the opinion is also internally inconsistent given its express statement that Dr. McCormick expected Stepp's condition to improve. We therefore conclude that the ALJ articulated sufficiently compelling reasons for electing to give Dr. McCormick's work-preclusive evaluation little weight.

■ Stepp also argues that the ALJ erroneously omitted discussion of Dr. Ritter's assessment, on two separate occasions, that Stepp suffered from a short-term inability to work. The first assessment occurred in June 2009, when Dr. Ritter determined that, in light of recent surgery, Stepp should refrain from working until she was "fairly far along" in the healing process; Dr. Ritter predicted, however, that Stepp would be able to return to work "without restrictions" by mid-September. Because this assessment and the anticipated date of Stepp's return to work both predated the alleged onset of Stepp's disability (November 18, 2009), we do not find the assessment particularly probative of Stepp's condition during the adjudicative period. Moreover, Stepp did return to work—albeit briefly—in early November 2009, thereby indicating that Dr. Ritter's June 2009 work-preclusive assessment had expired. As a result, the

ALJ did not err in declining to discuss this first assessment.

■ Stepp also complains that the ALJ did not cite Dr. Ritter's January 2010 statement that, in light of additional treatment, Stepp needed to "hold off on work for another few weeks." While this assessment occurred during the adjudicative period, and is therefore more relevant to Stepp's disability analysis than Dr. Ritter's previous assessment, any error on the ALJ's part in failing to discuss this evidence was harmless. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir.2010) (reaffirming that harmless error applies to Social Security cases). Under 42 U.S.C. § 423(d)(1)(A), Stepp is required to demonstrate that she suffers from a *long-term* disability, which must last or be expected to last at least twelve months. Dr. Ritter's assessment, however, was—by its own terms—temporally limited and suggested that Stepp would be unable to work for only a few weeks. And even though Stepp's inability to work appears to have lasted longer than Dr. Ritter anticipated, he effectively withdrew his work-preclusive opinion when he cleared Stepp to return to work in July 2010—less than a year after her disability onset date.

■ Stepp next contends that the ALJ ignored "entire lines of evidence" relating to Stepp's alleged manipulative impairment, as demonstrated by her moderate left carpal tunnel syndrome. We disagree. The ALJ acknowledged Stepp's carpal tunnel and determined at step two of the five-step analysis that the impairment was not severe. She further explained that Stepp had introduced "no evidence of limitations related to this impairment that have lasted or can be expected to last for twelve consecutive months." To support her finding that Stepp did not suffer from a significant impairment, the ALJ referenced opinions from several physicians indicating that

Stepp's manipulative abilities were satisfactory: Dr. Ritter and Dr. Mokadem observed normal grip strength at various points throughout the adjudicative period, while Dr. Lulich noted only slightly diminished strength. Moreover, although the ALJ did not find Stepp's alleged manipulative impairment to be severe, she did place some manipulative limitations on Stepp's ability to perform sedentary work. These limitations credited Dr. Ritter's findings that Stepp experienced weakness in her upper extremities and slightly reduced deltoid strength; they also highlight the ALJ's efforts to give appropriate weight to conflicting medical opinions. We therefore believe that the ALJ's conclusion that Stepp did not suffer from any significant manipulative impairment was supported by substantial evidence.

At 5′6″ tall and 237 pounds, Stepp has a body mass index of 38.2, which qualifies her as obese. As Stepp correctly notes, the ALJ's decision makes no mention of her obesity. We have determined, however, that "an ALJ's failure to explicitly consider an applicant's obesity is harmless if the applicant did not explain how her obesity hampers her ability to work." *Dornseif v. Astrue*, 499 Fed.Appx. 598, 600 (7th Cir.2013) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.2004)). Stepp has made no attempt at such an explanation here and, unlike other cases in which we have criticized an ALJ's failure to reference a claimant's obesity, the record does not suggest that Stepp's treating physicians discussed her weight in any detail. *Cf. Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir.2012) (noting that "[s]everal other physicians specifically discussed Arnett's obesity," and rebuking the ALJ's failure to mention those opinions). As a result, any error on the part of the ALJ in neglecting to discuss Stepp's obesity was harmless.

Finally, Stepp alleges that the ALJ erroneously determined that Stepp's testimony was not credible. We have explained that, "[b]ecause the ALJ is in the best position to determine a witness's truthfulness and forthrightness," we will overturn an ALJ's credibility determination only if it is "patently wrong." *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir.2012) (citation and internal quotation marks omitted). We have also established that an ALJ is "free to discount the applicant's testimony on the basis of the other evidence in the case" as "[a]pplicants for disability benefits have an incentive to exaggerate their symptoms." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir.2006).

Here, the ALJ made only a partially adverse credibility finding. Although she determined that Stepp's testimony was not fully supported by the record, she also discounted opinions from other physicians that seemed to understate Stepp's condition. For instance, the ALJ assigned "little weight" to state agency medical consultant Dr. Dobson's determination that Stepp could perform "light work" (i.e., that she could lift twenty pounds occasionally and ten pounds frequently, and that she could stand and/or walk for up to six hours in an eight-hour workday), concluding that the record demonstrated that Stepp was "more limited" than Dr. Dobson determined. The ALJ ultimately found that Stepp could perform sedentary work—which is less taxing than "light work"—with a few additional limitations. *Cf. Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir.2007) (noting, with approval, that the ALJ "did not totally discount [claimant's] testimony regarding how her pain affected her ability to perform certain activities, as evinced by the ALJ's decision to limit [claimant's] range of work to sedentary when assessing her residual functional capacity"). The ALJ acknowledged that Stepp continued to report chronic pain throughout the adjudicative period but concluded that the record demonstrated

improvement in Stepp's condition following surgery, medication changes, and therapy. While the ALJ credited Stepp's assertion that she still experienced residual pain, the ALJ determined that such pain "does not equate to disability." In light of all of the evidence before her, we believe that the ALJ's finding that Stepp's testimony was only partially credible was not patently wrong.

Stepp's case is a close one. Her condition appears to have been in constant flux as a result of several surgical procedures and medication changes throughout the adjudicative period. Further, the many medical opinions issued by various physicians and evaluators vary dramatically in their assessment of Stepp's impairments and abilities. Ultimately, we believe that the ALJ competently grappled with competing evidence and provided legitimate reasons for favoring certain pieces of evidence over others. We therefore conclude that the ALJ's denial of Stepp's request for benefits was supported by substantial evidence.

## B. Additional Evidence Before the Appeals Council

Stepp's next contention is that her case should be remanded for consideration of "new and material" evidence that the Appeals Council allegedly declined to review.

After the ALJ determined that Stepp did not suffer from a disability because her medical impairments appeared to improve over the course of the adjudicative period to the point where she was capable of performing sedentary work, Stepp submitted to the Appeals Council additional treatment notes from various physicians, including pain management specialist Dr. Allan MacKay, which Stepp argues tend to show that her back and neck pain did not, in fact, improve. The Appeals Council summarily denied Stepp's application for review, explaining that the "additional evidence" she presented "d[id] not provide a basis for changing the [ALJ]'s decision."

■ Under 20 C.F.R. § 404.970(b), additional evidence submitted to the Appeals Council will be evaluated only if it is "new and material" [2] and "relates to the period on or before the date of the [ALJ] hearing decision." If the newly submitted evidence satisfies these conditions, the Appeals Council shall incorporate that evidence into the administrative record and shall then evaluate that record, "including the new and material evidence." *Id.* However, the Council will only grant de novo review of the ALJ's decision if it determines, based on the supplemented record, that the ALJ's conclusions are "contrary to the weight of the evidence." *Id.*

**2.** We discuss this terminology in greater detail below. However, by way of introduction, evidence is considered "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding," and it is considered "material" if there is a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered" in the first instance. *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir.1997) (citation and internal quotation marks omitted).

Claimants in our circuit, however, enjoy no such benefit. We have established that evidence that the Appeals Council has deemed new and material but inadequate to require reversal must be excluded from the record before the district court in its review of the ALJ's decision. *See Eads,* 983 F.2d at 817–18 (noting that the ALJ "cannot be faulted for having failed to weigh evidence never presented to him"); *accord Mills v. Apfel,* 244 F.3d 1, 4 (1st Cir.2001); *Cotton v. Sullivan,* 2 F.3d 692, 695–96 (6th Cir.1993); *see also Matthews v. Apfel,* 239 F.3d 589, 594 (3d Cir.2001). We therefore proceed with particular caution in analyzing whether the Appeals Council deemed Dr. MacKay's records "new and material" as Stepp's ability to obtain review of this crucial evidence hinges solely on that distinction.

■ Our ability to review the Appeals Council's decision in the instant case is dependent on the grounds on which the Council declined to grant plenary review. If the Council determined Stepp's newly submitted evidence was, for whatever reason, not new and material, and therefore deemed the evidence "non-qualifying under the regulation," we retain jurisdiction to review that conclusion for legal error. *Farrell v. Astrue,* 692 F.3d 767, 771 (7th Cir.2012); *see also Eads v. Sec'y of the Dep't of Health & Human Servs.,* 983 F.2d 815, 817 (7th Cir.1993) (explaining that if the Council's decision not to review a case "rests on a mistake of law, such as the determination . . . that the evidence newly submitted to the Appeals Council was not material to the disability determination, the court can reverse"). However, if the Appeals Council deemed the evidence new, material, and time-relevant but denied plenary review of the ALJ's decision based on its conclusion that the record—as supplemented—does not demonstrate that the ALJ's decision was "contrary to the weight of the evidence"—the Council's decision not to engage in plenary review is "discretionary and unreviewable." *Perkins v. Chater,* 107 F.3d 1290, 1294 (7th Cir.1997).[3]

■ Stepp contends that the Appeals Council rejected her newly submitted evidence—specifically, Dr. MacKay's treatment notes—as non-qualifying. She points out that, in the body of its denial notice, the Council made no mention whatsoever of Dr. MacKay's notes. For a variety of reasons that we address in some detail below, the Commissioner insists that the Appeals Council accepted this evidence as new and material but, upon reviewing the supplemented record, determined that the evidence was insufficient to trigger plenary review of the ALJ's unfavorable decision. The district court grudgingly sided with the Commissioner on this issue, concluding that the information included in the denial notice and accompanying order "suggests—however thinly—that the Council reviewed [Dr. MacKay's notes.]" *Stepp,* No. 2:13–cv–179, 2014 WL 3809661 at *2.

We have decided numerous cases in which claimants have argued—with varying degrees of success—that the Appeals Council rejected their newly proffered evidence as non-qualifying. In *Perkins v. Chater,* 107 F.3d 1290, the claimant sought review of an unfavorable ALJ decision and submitted to the Appeals Council additional medical evidence prepared by psychologist Dr. William Reich. *Id.* at 1292. As here, the Council "decided that neither [Perkins's] contentions nor the additional evidence provide[d] a basis for changing the [ALJ's] decision." *Id.* Importantly, however, the Council in *Perkins* expressly evaluated the additional evidence submitted by the claimant; in fact, "[i]ts letter de-vote[d] a paragraph to Dr. Reich's review of [Perkins's] file," *id.* at 1294, before denying Perkins's request for plenary re-

---

3. The effect of this dichotomy is mitigated in some of our sister circuits, which have held that when the Appeals Council finds evidence to be "new and material" (but nevertheless insufficient to require reversal of the ALJ's decision), "that evidence becomes part of the administrative record, which the district court must consider when reviewing the [ALJ]'s final decision for substantial evidence" under 42 U.S.C. § 405(g). *Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1163 (9th Cir. 2012); *see also Higginbotham v. Barnhart,* 405 F.3d 332, 337 (5th Cir.2005); *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996); *O'Dell v. Shalala,* 44 F.3d 855, 859 (10th Cir.1994); *Keeton v. Dep't of Health & Human Servs.,* 21 F.3d 1064, 1067 (11th Cir.1994); *Nelson v. Sullivan,* 966 F.2d 363, 366 (8th Cir.1992); *Wilkins v. Sec'y, Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir.1991). By incorporating that evidence into the record before the district court, these circuits offer claimants an additional opportunity for review of that pertinent information.

view. *See Perkins v. Chater,* No. 94–C–4370, 1995 WL 579540, at *2 (N.D.Ill. Sept. 28, 1995) (quoting the Appeals Council's denial notice, which addresses Dr. Reich's notes in some detail), *aff'd,* 107 F.3d 1290. We concluded that, by specifically addressing the content and persuasiveness of Dr. Reich's records, the Council must have accepted that evidence as "new and material" under the regulation; the Council's unfavorable decision was therefore "discretionary and unreviewable." *Perkins,* 107 F.3d at 1294.

In *Farrell v. Astrue,* 692 F.3d 767, however, we reached the opposite conclusion. There, an ALJ had denied Farrell's claim for benefits, in part because the record did not contain evidence confirming that Farrell had been diagnosed with fibromyalgia—her asserted severe impairment. *Id.* at 771. In response to the ALJ's unfavorable decision, Farrell submitted to the Appeals Council test results from Dr. Ryan Loyd, which reflected a firm diagnosis of fibromyalgia. *Id.* at 770. In spite of this additional evidence, the Appeals Council summarily denied Farrell's petition for review. *Id.* The Council's decision explained that it had "considered . . . the additional evidence . . . [and] found that this information d[id] not provide a basis for changing the [ALJ's] decision," *id.* at 771—standard boilerplate language identical to the language of Stepp's denial notice. Analyzing that language, we explained:

> this text, which often appears in orders of the Appeals Council rejecting plenary review, is not as clear as it might be. On the one hand, it might indicate that the Appeals Council found the proffered new evidence to be immaterial, but on the other hand it might indicate that the Council accepted the evidence as materi-

al but found it insufficient to require a different result.

*Id.* Without more specific language from the Council, we interpreted the denial notice to imply the former conclusion—i.e., that the Council "rejected Farrell's new evidence as non-qualifying under the regulation." *Id.* We then proceeded to review the "limited question" of whether the Council had erroneously concluded that the newly submitted evidence was not new and material. *Id.*

The Appeals Council's order and denial notice in the instant case are similar to those that were at issue in *Farrell.* Crucially, neither denial notice references the relevant medical records—those of Dr. MacKay and Dr. Loyd, respectively—by name. It is true that Stepp's denial notice expressly mentions two other pieces of newly submitted evidence—medical records from Centerstone (dated December 28, 2011) and medical records from IU Health Bloomington (dated March 12, 2012)—which the Council declined to consider, but these records were rejected because they pertained to Stepp's condition *subsequent to* the date of the ALJ's decision (November 21, 2011) and were therefore not time-relevant. The requirement that newly submitted evidence "relate[ ] to the period on or before the date of the [ALJ] hearing decision," 20 C.F.R. § 404.970(b), is distinct from the mandate that it also be "new and material";[4] therefore, the fact that the Council noted that these records were not time-relevant says nothing about whether they were otherwise found to be new and material, and says even less about whether those records that were not mentioned—including Dr. MacKay's notes—were deemed new and

---

4. Although the time-relevance requirement and the newness requirement may appear mutually exclusive at first glance, evidence may satisfy both conditions if, for instance, it was created just prior to the issuance of the ALJ's decision, or if it had long been in existence but for some reason was previously unavailable to the claimant.

material. The most that we can infer from the denial notice's express designation of two sets of records as not time-relevant is that Dr. MacKay's notes *were* found to be time-relevant (a correct finding, given that the notes were created between September 20 and October 25, 2011—prior to the issuance of the ALJ's decision). Whether they were also found to be new and material remains unclear.

The Commissioner next points out that Stepp's denial notice explains, "In looking at your case, [the Council] considered . . . the additional evidence listed on the enclosed Order of Appeals Council," and that the order does, in fact, list "Medical record from Dr. Allan MacKay" as Exhibit 26F. The Commissioner argues that the inclusion of Dr. MacKay's notes in the list of exhibits conclusively establishes that the Council deemed those notes new and material. But the newly proffered evidence in *Farrell* was also listed—albeit in less specific terms—on the Order of Appeals Council there.[5] And just as the inclusion of that evidence on the exhibit list was insufficient to persuade us that the *Farrell*

Appeals Council had accepted the newly submitted evidence as new and material, it is similarly insufficient to persuade us here.[6]

Finally, the Commissioner makes much of the fact that Stepp's denial notice states that the Council "considered whether the [ALJ's] action, findings, or conclusion is contrary to the weight of evidence of record." The Commissioner insists that this language—which was absent from the *Farrell* denial notice—makes clear that the Appeals Council found Stepp's newly submitted evidence to be qualifying and proceeded to evaluate whether it was sufficient to require de novo review of the ALJ's unfavorable decision. We disagree. To us, this boilerplate language is little more informative than the similarly standardized language employed by the Council in *Farrell,* which explained that the "information [submitted to the Appeals Council] d[id] not provide a basis for changing the [ALJ]'s decision." In *Farrell,* we rejected the contention that this language was sufficiently specific to confirm that the Council had accepted and

---

**5.** The order in *Farrell* lists as its sole exhibit "[m]edical evidence submitted by the claimant's representative in conjunction with the request for review." While Dr. Ryan Loyd—whose fibromyalgia diagnosis was presented to the Appeals Council as new evidence—is not mentioned by name on the exhibit list (as Dr. MacKay is identified in the exhibit list here), the pleadings in *Farrell* do not suggest that Farrell submitted any other purportedly "new" evidence to the Council. We therefore see no material difference between the exhibit lists in each case.

**6.** In support of her argument that the Council accepted Dr. MacKay's notes as new and material, the Commissioner also relies heavily on the Social Security Administration's internal operating procedures, as articulated in its Hearings, Appeals, and Litigation Law ("HALLEX") manual. According to the Commissioner, HALLEX requires that the Appeals Council list evidence that is "new, material, and relates to the period at issue" as an exhibit on the order accompanying a denial notice. HALLEX I–3–5–20, *available at* http://ssa.gov/OP_Home/hallex/I–03/I–3–5–20. html (last visited July 27, 2015). Because Dr. MacKay's notes were included in the exhibit list here, the Commissioner argues that the Council must therefore have accepted that evidence as qualifying. But subsection I–3–520 also demands that, when evidence is found to be new and material, "language in the denial notice *specifically identify* [ ] the evidence (by source, date range, and number of pages)." Here, however, the denial notice makes vague reference only to "additional evidence listed on the enclosed Order" and does not itself mention source, date range, or page numbers. As a result, the denial notice does not appear to strictly comply with the applicable HALLEX procedures for evidence that is deemed new and material, and we are unpersuaded by the Commissioner's invocation of these procedures as support for the agency's position.

reviewed the newly submitted evidence, and we likewise reject the Commissioner's argument here.

In sum, while Stepp's case clearly falls somewhere on the spectrum between *Perkins* and *Farrell*, we believe it is closer to *Farrell*. The minimal information provided by the Appeals Council in its denial of Stepp's request for review is insufficient to allow us to determine with any confidence that the Council accepted Dr. MacKay's notes as new and material evidence. While the Commissioner has pointed to a handful of ambiguous references in the order and denial notice that suggest that the Appeals Council may have deemed this evidence qualifying, these references fall considerably short of the Council's express analysis of the newly submitted evidence at issue in *Perkins*. We therefore cannot conclude that these abstruse signals, without more, demonstrate that the Council considered Dr. MacKay's treatment notes.[7] As we did in *Farrell*, "[w]e thus interpret the Appeals Council decision as stating that it has rejected [Stepp's] new evidence as non-qualifying under the regulation." 692 F.3d at 771.

■ Given this conclusion, we review de novo the Appeals Council's determination that Dr. MacKay's notes did not qualify as "new and material" under 20 C.F.R. § 404.970(b), *Farrell*, 692 F.3d at 771, and conclude that this determination amounted to legal error. These records are "new" because they were "not in existence or available to the claimant at the time of the administrative proceeding." *Perkins*, 107 F.3d at 1296 (citation and internal quotation marks omitted). Dr. MacKay's treatment notes—dated September 20 through October 25, 2011—were created subsequent to Stepp's August 24, 2011 hearing and only shortly before the ALJ issued her unfavorable benefits decision on November 21 (also the date on which Stepp submitted Dr. MacKay's records to the Appeals Council). Although the Commissioner criticizes Stepp for failing to submit these records earlier, Stepp's relatively minor delay was reasonable. Medical records are not instantaneously transmitted from a treating physician to the Social Security Administration upon their creation; rather, a claimant's representative must learn that specific treatment has been provided, request the relevant treatment notes, obtain them from the physician, and deliver them to the agency. As a result, the four-week time lag at issue here does not alter our conclusion that Dr. MacKay's notes are indeed "new" within the meaning of § 404.970(b).

Dr. MacKay's treatment notes are also "material." We have found evidence to be "material" under § 404.970(b) if it creates a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Perkins*, 107 F.3d at 1296 (citation and internal quotation marks omitted). Here, the ALJ's decision rested—in large part—on the conclusion that Stepp's condition had improved over the course of the adju-

---

7. While we have held that the Appeals Council may deny review without articulating its reasoning, *e.g.*, *Damato v. Sullivan*, 945 F.2d 982, 988–89 (7th Cir.1991), that holding in no way contradicts the requirement we enforce today that the Council must identify in a sufficiently clear manner which evidence (if any) it evaluated in reaching its decision to decline plenary review. We once again emphasize, however, that "we neither encourage denying requests for review without articulating the reasoning nor approve of the same," and remind the Commissioner that, "in all fairness to the party appealing the ALJ's decision, the Appeals Council should articulate its reasoning." *Id.* at 989 n. 6. Perhaps even more important than fairness to claimants, if the Council were to explain its reasoning—if only briefly—much of the confusion that we grapple with in this appeal relating to the identification of evidence that the Council considered might be avoided.

dicative period. Dr. MacKay's files, however, undermine that position. *See Farrell*, 692 F.3d at 771 (concluding that the newly submitted evidence was material because "the ALJ's [unfavorable] decision unequivocally rest[ed] in part on the determination that there [wa]s no evidence that [a fibromyalgia] diagnosis ha[d] been confirmed[, but] Farrell's new evidence fill[ed] in that evidentiary gap by providing exactly that confirmation"). Dr. MacKay's notes reveal not only that Stepp continued to complain of severe back and neck pain (as well as burning and numbness) as late as October 2011, but also that Dr. MacKay believed that Stepp's condition required additional invasive treatment—including multiple nerve block injections and a cervical fusion. Dr. MacKay's notes also summarize the results of an October 2011 MRI: degenerative changes throughout Stepp's thoracic spine, degenerative disc disease throughout her lumbar spine, and several disc protrusions all indicate a gradually worsening condition. Given this persuasive evidence that Stepp was not, in fact, on an upward trajectory at the end of the adjudicative period, we remand the case to the ALJ to re-evaluate Stepp's RFC in light of the information presented in Dr. MacKay's notes.[8]

### III. Conclusion

The decision of the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED to the Social Securi-

ty Administration for further proceedings consistent with this opinion.

---

8. Stepp also argues, in the alternative, that we may remand the case for further consideration under sentence six of 42 U.S.C. § 405(g), which permits remand in situations where "there is new evidence which is material and ... there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." However, as we explained in *Farrell*, evidence that has been submitted to and rejected by the Appeals

Council does not qualify as "new" within the meaning of § 405(g). *See* 692 F.3d at 770; *see also DeGrazio v. Colvin*, 558 Fed.Appx. 649, 652 (7th Cir.2014) ("The evidence that the Commissioner characterized as 'new' in her motion—the audiometric report that confirmed DeGrazio's hearing loss—was not new for purposes of sentence six because it already had been presented to the Appeals Council.").