## NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 30, 2019[*]
Decided May 30, 2019

*Before*

DIANE P. WOOD, *Chief Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 18-2664

| | |
|---|---|
| EMPEROR A. ELDER,<br>　　*Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 15-cv-11883 |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br>　　*Defendant-Appellee*. | Andrea R. Wood,<br>*Judge*. |

## O R D E R

Emperor Elder appeals the district court's decision to uphold an Administrative Law Judge's denial of his application for Disability Insurance Benefits and Supplemental Security Income. Elder argues principally that the ALJ's factual determinations and adverse credibility finding are not supported by the record. Substantial evidence supports the ALJ's decision, however, so we affirm the judgment.

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

Elder sustained significant injuries from a 2007 car accident, which he says were exacerbated by another accident in 2012. He applied for disability benefits in December 2012, claiming that he had been unable to work since January 15, 2010, because of the following conditions: nerve damage in his left arm; chronic seizures, spasms, and pain; limited or restrictive nerve messaging on his body's left side; blackouts and losses of consciousness; migraines; and dizziness. The Social Security Administration denied Elder's claims on initial review and on reconsideration.

Elder then had a hearing before an ALJ. He testified that he cannot work because his injuries require constant care. He stated that the Illinois Department of Human Services deemed him disabled and provided him with a home-care assistant. Elder further testified that he suffered from partial and convulsive seizures daily, but his medications help when he takes them. When the ALJ inquired why he sometimes does not take his medications, he replied that he was unable to take them while in law-enforcement custody. Elder went on to testify about pain along the entire left side of his body, including his abdomen, neck, shoulder, spine, and pelvis. He said that he also suffers migraines twice per week with associated chest pain (for which he takes medication) and memory problems. Because he has "excessive pain" and takes "prescription pills all day," Elder testified, he is not able to "keep a frame of mind without some type of assistance." The ALJ asked Elder if he used marijuana or other drugs, and he said he did not.

In terms of his limitations, Elder testified that he cannot sit for very long because of his back and hip injuries; standing is worse, and he prefers to lie down. He said that he cannot lift anything "even minor." His personal care assistant helps with all of his hygiene needs, including bathing and grooming, and all of his housework. He stated that he cannot drive and must be accompanied by another adult any time he is with his young daughter because he could have a seizure. He responded to the ALJ that he "definitely" has trouble keeping his thoughts on track, concentrating, and sticking to the task at hand.

A vocational expert also testified. The ALJ asked the expert a series of questions based on a hypothetical claimant, adding progressively more restrictions each time. She first asked him to consider a hypothetical person with a residual functional capacity to do light work with the following restrictions: no more than occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; never working around hazards; able to frequently use the non-dominant upper extremity for reaching, fingering, handling, and feeling; able to perform simple, routine tasks and make simple work-related decisions; never working

with the general public; occasional contact with coworkers and supervisors; and never working in loud-noise environments. The expert replied that such a person could work as a sorter, assembler, or packer. Next, the expert testified that even if the individual was limited to sedentary, sit-down work and required occasional use of a cane, the same jobs were available. But, if the individual could only occasionally finger, feel, and reach overhead with the non-dominant left arm, the expert opined that no jobs would be available at either the light or sedentary level. Nor would work be available if someone were off task 15 to 20 percent of the workday due to distraction or pain.

In her decision, the ALJ applied the required five-step analysis, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), and concluded that Elder was not disabled. At step one, she observed that Elder had not worked since his alleged onset date of January 15, 2010. At step two, she determined that Elder suffered from several severe impairments: left-hand mild degenerative joint disease, left upper-extremity brachial plexus neuropathy, lumbar and cervical degenerative disc disease, seizure disorder with post-traumatic encephalopathy, right sensorineural hearing loss, mixed anxiety and depression, and personality disorder. But at step three, the ALJ found that Elder's impairments did not meet or equal a listed impairment.

In making these determinations, the ALJ credited the medical evidence in the record over Elder's testimony, which she found not credible because his "[m]edical records do not reflect the alleged severity of [his] impairments." Regarding Elder's left-arm and left-side injuries, the ALJ observed that medical imaging documented unremarkable or mild findings, and examinations showed a mostly normal range of motion and sensory abilities. For instance, a March 2013 consultative examination report noted "no limitations" in Elder's range of motion and gait. As to Elder's seizures, the ALJ explained that Elder visited the emergency room several times for treatment or to refill his seizure medication but each time, she observed, doctors found no focal neurological deficits, and electroencephalograms were either normal or mildly abnormal. The ALJ also emphasized that Elder had a history of non-compliance with seizure medication, even though Elder and his primary care physician, Dr. Chantal Tinfang, reported that he responded well to his seizure treatment.

The ALJ also found that Elder's inconsistent statements as well as record evidence of "possible malingering" and "drug seeking behavior" detracted from his overall credibility. For instance, at the hearing, Elder denied using marijuana or any other drugs, but various medical records show that Elder reported using marijuana "on and off" or "daily." The ALJ observed that a consulting psychiatrist found Elder's responses to his questions "somewhat manipulative." A consulting physician said that

Elder "gave inconsistent and sometimes vague medical history." The ALJ also noted that emergency room staff once observed Elder using his left arm after reporting that he was unable to move it, and she cited a physician's assistant's statement that Elder's "current state does not reflect the history just given" when he showed up to an emergency room in 2012 reporting to have been hit by a car two days earlier and requested hydrocodone (a painkiller) despite negative x-rays and no signs of distress. Elder also made inconsistent statements about whether his injured left arm was his dominant arm.

At step four, the ALJ ruled that Elder had the residual functional capacity to perform light work subject to the restrictions in her first (least restrictive) hypothetical question to the vocational expert. Finally, at step five, she credited the expert's testimony that there were jobs that Elder could perform in the national economy and ruled that he is not disabled.

The Appeals Council denied Elder's request to review the ALJ's decision, making it the final decision of the Commissioner. Elder then sought review in the district court, which concluded that substantial evidence supported the ALJ's decision. Elder appeals that judgment. We review an ALJ's final decision deferentially, inquiring whether substantial evidence supports it. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence, though "more than a mere scintilla," means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] judgment for that of the Commissioner." *Burmester*, 920 F.3d at 510 (internal quotation marks and citation omitted).

Because Elder's testimony was his only evidence of functional limitations beyond those that the ALJ included in the residual functional capacity, we begin with Elder's argument that the ALJ improperly discredited him. The ALJ is best positioned to determine a witness's credibility, so we will overturn her determination only if it is "patently wrong." *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015). In all, the inconsistencies between Elder's testimony and the record evidence—including his drug use, handedness, medication noncompliance, and possible malingering and drug-seeking behavior—substantially support the ALJ's finding that Elder was not credible.

Elder contends that the ALJ should not have used his seizure-medication noncompliance to detract from his credibility because it was due to memory problems, incarceration, financial, and transportation issues. But the ALJ need only consider Elder's explanations for not following treatment; she does not have to accept them as

true. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). In any event, Elder did not say precisely when he was incarcerated, but the medical records are enough to demonstrate that incarceration could not account for all his admitted noncompliance over many years. That was the only reason Elder gave the ALJ; he did not cite memory, financial, or transportation restraints as reasons for not taking his medications, so we cannot say now that the ALJ erroneously failed to consider those reasons. *See Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004) (arguments raised first on appeal are waived).

Regarding the various medical professionals' noted concerns about malingering, inconsistencies, and drug seeking, Elder argues that the providers were either biased against him or mistaken. (For example, he says that the emergency-room nurse saw his arm spasm involuntarily.) But he offers no reason why all these providers would be biased, and speculation that they were biased or mistaken does not show that the ALJ was patently wrong. *See McHenry v. Berryhill*, 911 F.3d 866, 874 (7th Cir. 2018).

Elder also argues that the ALJ erred in discrediting his testimony about his subjective pain and the frequency of his seizures. But an ALJ may discount an applicant's testimony if, as in this case, other evidence in the record provides a basis for doing so. *Stepp*, 795 F.3d at 720. Here, the ALJ cited specific medical evidence conflicting with Elder's testimony, and "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005). Further, the ALJ did not discount the complaints of pain for being "subjective," which is not allowed. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). And despite finding Elder not credible, the ALJ still granted him several limitations to his residual functional capacity—for example: occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs and no climbing of ladders, ropes, or scaffolding—that account for pain and seizures.

Because we conclude that the ALJ's credibility determination was not patently wrong, Elder would need other evidence that he has functional limitations that preclude him from performing any work. And although the record substantiates that he has severe impairments, as the ALJ concluded, Elder is unable to point to any objective evidence that he cannot sit or stand, walk more than minimally, use his left arm, or maintain focus. On the other hand, as summarized above, the ALJ pointed to specific medical evidence to support her conclusion that Elder maintains the functional capacity to perform light work with various restrictions.

None of Elder's arguments undermine the sufficiency of the evidence supporting the ALJ's conclusion. First, he argues that the ALJ ignored the determination of

Dr. Tinfang, his primary care physician, that he could not work. But the ALJ did not "ignore" the report—she cited Dr. Tinfang's finding that Elder had a "[g]ood response to treatment" for his seizure disorder. Further, Dr. Tinfang did not opine that Elder could not work; she listed "not able to work due to recurrent seizure, spasm, chronic left arm spasm, radiating to the left knee" as one of Elder's chief complaints.

Second, Elder argues that the ALJ failed to consider his testimony that the Illinois Department of Human Services deemed him disabled and provided him with a home-care assistant. But his assertion is not fully supported. The record includes a one-page document completed by an unidentified case manager showing that Elder received funding for 32.5 hours of personal assistance per week from November 2014 through May 2015. But the document does not state that Elder is disabled or contain any diagnoses or descriptions of limitations Elder was found to have.[1]  It might have been prudent for the ALJ to develop the record about Elder's home services because he had no lawyer, *see Nelms v. Astrue*, 553 F.3d 1093, 1099 (7th Cir. 2009), but Elder does not argue that she failed to do so or explain why he could not support his claim that the state found him disabled. Moreover, the ALJ noted Elder's testimony about his care assistant in her decision, and we cannot say that she erred in relying on the other evidence in the record that substantially supports her conclusions.

Third, Elder argues that the ALJ was wrong to set aside third-party statements from his mother-in-law, his wife, his grandmother, and his homecare assistant attesting to his seizure disorder simply because the statements came from family members. But the ALJ permissibly discounted those statements because they were inconsistent with the objective medical evidence, not because the third parties were related to him. *See Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996). In any event, the ALJ did include Elder's seizure disorder on the list of "severe" impairments—but, under the law, it was not disabling because she concluded that it was controllable with medication. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006).

Elder also points out various problems he sees with the evidence credited by the ALJ. For instance, he faults some doctors for not performing the right tests and again

---

[1]  The document is silent as to what entity it originates from, but it likely comes from the Home Services Program, provided by the Illinois Department of Human Services' Disability & Rehabilitation Services. This is not the same office within IDHS as the Bureau of Disability Determination Services, often referred to in Social Security cases as "the state agency," which employs the medical consultants and provides the federally funded benefits to Illinois residents determined to be disabled.

accuses them of bias. But "[t]he claimant bears the burden of producing medical evidence that supports h[is] claims of disability." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). Impeaching the evidence is not enough to meet that burden.

Finally, Elder contends that November 16, 2007 (the date of his initial accident), is the proper onset date, and not January 15, 2010 (the date he indicated on his application). Because we uphold the ALJ's decision that he is not disabled, however, we need not address the argument.

AFFIRMED